**SIGNED THIS: December 12, 2005**

_____
**THOMAS L. PERKINS**
**UNITED STATES BANKRUPTCY JUDGE**
_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| MARTY W. VOGEL, | ) | |
| | ) | No. 03-85151 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| HERITAGE BANK OF CENTRAL ILLINOIS, | ) | |
| an Illinois banking corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 04-8018 |
| | ) | |
| MARTY W. VOGEL, | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N

The matter is before the Court after trial of the Complaint filed by Heritage Bank of

Central Illinois (HERITAGE) to determine the dischargeability of a debt owed by Marty

W. Vogel, the Debtor (DEBTOR), pursuant to Sections 523(a)(2)(A), (a)(4) and (a)(6), or

alternatively, to deny him a discharge under Sections 727(a)(2) and (a)(4).

## FACTUAL BACKGROUND

In October, 1989, the DEBTOR, a crane rental contractor, formed Vogel Crane Rental, Inc. (VCR). The DEBTOR was the sole director, officer and shareholder. On April 20, 1999, HERITAGE loaned VCR $25,000, secured by a 1973 Grove crane. On August 3, 2000, HERITAGE loaned VCR $31,141.43, secured by a blanket security interest in inventory, chattel paper, accounts, equipment and general intangibles. On that same date, HERITAGE loaned the DEBTOR $48,696.03, secured by a 1975 Grove crane and a blanket security interest (inventory, chattel paper, accounts, equipment and general intangibles). The DEBTOR personally guaranteed HERITAGE'S loans to VCR. Citicapital, another of VCR'S lenders, had a prior perfected security interest in a Terex crane and a 1987 Grove crane. At one point, VCR had eleven employees and eleven cranes.

In the summer of 2002, VCR failed to make payments on the HERITAGE loans.[1] On July 19, 2002, Bill Koenig, the loan officer in charge of VCR'S accounts, and Scott Hedden, HERITAGE'S president, held a meeting with the DEBTOR. The DEBTOR represented that VCR'S income was better than it had been in the past. HERITAGE agreed to forego collecting the default if VCR would make the payments called for by each of the notes going forward. The DEBTOR, in an attempt to reduce his personal expenses, sold his corvette. When VCR failed to make the payments in both July and August, HERITAGE wrote VCR on September 10, 2002, demanding that the default of $10,212.90 be cured by September 19, 2002. On September 13, 2002, the DEBTOR, unable to cure the entire default, made one payment on each of two notes and two payments on the third note.

---

[1]VCR missed the May, June and July payments.

Koenig, Hedden and the DEBTOR met again on October 22, 2002. Having reviewed the records for VCR'S checking account prior to the meeting, it was apparent to HERITAGE that VCR could not bring the loans current. At that time, the loan balances totaled approximately $62,500. HERITAGE was aware of the DEBTOR'S personal financial troubles stemming from a lawsuit brought against him by a former companion. The DEBTOR gave HERITAGE a list of VCR'S open invoices, showing accounts receivable of $45,537.50. Conceding that VCR could not meet its expenses as well as pay the DEBTOR a sufficient salary to meet his personal debts, the DEBTOR brought up the possibilities of selling the Terrex crane and restructuring the debt to Citicapital, as well as selling the Linkbelt crane. HERITAGE did not object to the DEBTOR'S proposal to take the two older cranes to auction. The DEBTOR disclosed that he had received an offer to work for another company, the purchaser of the Terrix crane, but indicated that the salary offer of $50,000 to $60,000 was insufficient to cover his personal expenses. According to the DEBTOR, Hedden remarked that bankruptcy might be in HERITAGE'S best interests. Hedden denied making that statement, contending instead that it was the DEBTOR who first made mention of bankruptcy.

Based on those discussions, HERITAGE believed that the DEBTOR would proceed with the liquidation and submit a plan for restructuring VCR'S debt. In November, Koenig and Hedden met with the DEBTOR'S attorney to discuss the DEBTOR'S progress.[2] On December 13, 2002, Koenig wrote the DEBTOR, confirming the terms of an agreement

---

[2]According to Koenig's notes, he spoke with the DEBTOR'S attorney on November 18 and November 21. The first telephone conversation focused on the sale of the Linkbelt crane and the topic of the second telephone call dealt with the release of HERITAGE'S security interest in the Terex crane. Koenig's notes also reflect that he inquired of the DEBTOR on November 19, 2002, regarding the location of the Linkbelt crane.

reached with his attorney two days prior.  As outlined in the letter, the DEBTOR was to sell

the 1984 Linkbelt crane by December 20, 2002, paying $25,000 to HERITAGE from the

proceeds.  Upon receipt of the proceeds, HERITAGE would restructure the remaining debt,

with a monthly payment of $2,100.

The DEBTOR walked out of the October 22nd meeting with an entirely different

perspective.   Concluding that HERITAGE was not willing to work with him in

straightening out VCR'S financial difficulties, the DEBTOR formed Vogel Crane Company

(VCC), a new corporation, on October 25, 2002, after seeking the advice of his attorney.

Several days later, the DEBTOR filed a personal Chapter 13 bankruptcy petition.  No

ownership interest in any cranes was scheduled by the DEBTOR in that proceeding and

HERITAGE was not listed as a creditor.  That case was later dismissed.

Neither the DEBTOR nor his attorney advised HERITAGE of VCC'S existence.  The

DEBTOR continued to perform some work through VCR until late December, 2002, billing

on VCR invoices and depositing the payments received in VCR'S checking account at

HERITAGE.[3]  Some of the expenses of VCC were paid from VCR'S checking account.

When HERITAGE learned in late December that the DEBTOR was billing for his services

under a different company, it accelerated the notes and demanded the return of its

collateral.  HERITAGE set off VCR'S checking account balance of $1,626.58.  HERITAGE

repossessed the 1984 Linkbelt crane with the DEBTOR'S consent in early January, 2003.

---

[3]According to the DEBTOR'S exhibits, admitted without objection, the following deposits were made for work performed which was not included on the list of accounts receivable tendered to HERITAGE on October 22, 2002: River City Construction - $1,900; PJ Hoerr, Inc. - $800; Becker Construction Contractors, Inc. - $300; Woiwode Builders, Inc. - $250; DLD Title Services - $600; VanBuskirk Const - $400; Theinert Builders - $500; and Creek Development - $1,330.

Utilizing the list of account receivables from the October meeting, HERITAGE wrote the account debtors requesting that payment be sent to it.  The two older cranes were also repossessed and sold.

The DEBTOR had begun to perform work through VCC from its outset.  Although VCC had received two payments during December, 2002, those checks were held until January, 2003, when a VCC checking account was established at Morton Community Bank.  On January 13, 2003, the DEBTOR, as president of VCC, wrote to VCR'S old customers advising them of VCR'S dissolution and of the creation of the new company and its continuation of prior services.  On January 21, 2003, after the sale of the Terex crane, the DEBTOR refinanced the remaining balance due Citicapital of $30,122.86.  On February 25, 2003, HERITAGE brought suit in state court against VCR, the DEBTOR and the newly formed VCC, to collect the balance due on the notes.  HERITAGE alleged that VCC, having acquired all of the assets of VCR, was generally liable for its debts on a theory of successor liability.

On May 19, 2003, VCR filed a Chapter 7 petition, scheduling the 1987 Grove crane as an asset of the corporation. The 1987 Grove crane was valued at $30,000, encumbered by Citicapital's lien in that amount.  Unsecured claims were scheduled in the amount of $206,700.20.  Fearful that HERITAGE would execute on VCC'S accounts, on September 4, 2003, the DEBTOR withdrew $4,200 from the checking account at Morton Community Bank and gave it to his bookkeeper to keep at her home.  She established a "cash on hand" account to keep track of the deposits received and the payments made.  On September 30, 2003, judgment was entered in the state court proceedings in favor of HERITAGE and

5

against the DEBTOR and VCC for $49,820.17.  HERITAGE filed citations to discover assets against the DEBTOR and VCC.

The DEBTOR filed a Chapter 7 petition on October 31, 2003.  On his Statement of Affairs, the DEBTOR disclosed that he had transferred his home to his nephew in March, 2003, in order to save it from foreclosure, receiving little money in the transaction.  The DEBTOR scheduled his interest in VCR and VCC as valueless.  The DEBTOR included the 1987 Grove crane on Schedule B as having a value of $30,000, showing it as fully liened to Citicapital.  The DEBTOR listed general, unsecured claims totaling $251,818.31.  The DEBTOR, unaware of or disregarding HERITAGE'S subordinate interest,  intended to reaffirm the debt on the 1987 Grove crane.

On November 18, 2003, the DEBTOR closed VCC'S doors, due to the higher costs of insurance and union benefits.  At that time, the DEBTOR was engaged in primarily residential work, but he was required to pay full benefits to the union as if he were working at the commercial rate.  In July, 2004, he reincorporated and leased a larger crane which was more conducive to commercial work with the intent of reestablishing himself on the commercial side of the business.

HERITAGE brought this adversary complaint, seeking to determine that its debt is nondischargeable under Section 523(a)(2)(A), (a)(4) or (a)(6) or to deny the DEBTOR'S discharge under Sections 727(a)(2), (a)(4) or (a)(7).[4]   A trial was held on June 15, 2005, and

---

[4]The Complaint was originally brought against VCR and VCC in addition to the DEBTOR.  The Complaint was dismissed against VCR because corporations are not granted a discharge in a Chapter 7 proceeding.  The Complaint was dismissed against VCC because this Court determined that it lacked jurisdiction to grant the relief sought by HERITAGE against a nondebtor.

the Court took the matter under advisement.  HERITAGE and the DEBTOR submitted their

closing arguments in written briefs.[5]

HERITAGE seeks a determination that its debt is nondischargeable under Sections

523(a)(2)(A), (a)(4) and (a)(6) of the Bankruptcy Code.   These subsections provide, in

pertinent part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>
> * * *
>
> (2) for money, property, services, or an extension . . . of credit, to the extent obtained by –
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> * * *
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny
>
> * * *
>
> (6)   for willful and malicious injury by the debtor to another entity or to the property of another entity.

The burden is on the creditor to establish each element of the exception to the

dischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S.

279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).  In order to afford the debtor a "fresh

start," exceptions to discharge are construed strictly against the creditor and liberally in

favor of the debtor.  *In re Morris*, 223 F.3d 548 (7th Cir. 2000);  *Meyer v. Rigdon*, 36 F.3d 1375

(7th Cir. 1994).

---

[5]HERITAGE has taken a "shotgun" approach.  Each of the dischargeability/discharge counts incorporates in full  the 64 paragraphs of the "common" count and generally recites the elements of each provision making reference to the DEBTOR'S "course of conduct" as the factual basis of the claim.  In its brief submitted after the trial, HERITAGE failed to address the objections to the DEBTOR'S discharge, leaving the Court uncertain whether it has abandoned those claims.

## PRELIMINARY ANALYSIS

HERITAGE'S theory of nondischargeability may best be characterized as a "composite" one.   It is premised, in part, upon the theory of successor liability.   As a general rule, a corporation that purchases assets of another corporation is not liable for the debts and liabilities of the first, except (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a merger or consolidation; (3) where the purchasing corporation is merely a continuation of the first corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for the first corporation's debts.   *Nilsson v. Continental Mach. Mfg. Co.*, 251 Ill.App.3d 415, 418, 621 N.E.2d 1032 (Ill.App. 2 Dist. 1993).   HERITAGE maintains that VCC is liable for VCR'S debts under both the continuation and fraud exceptions.   There is no dispute here, and indeed the state court held that VCC was liable for HERITAGE'S debt. Liability of a successor corporation, however, is a different issue than the nondischargeability, as to the principal, of corporate debt guaranteed by him.

HERITAGE'S theory is also based on VCR'S ownership of the 1987 Grove crane, VCC'S use of that piece of equipment, and the DEBTOR'S resulting receipt of compensation from VCC.   Viewing VCC and VCR as one and the same, and relying on its lien on VCR'S receivables, HERITAGE claims that it was entitled to the income generated through VCC by the use of that crane and that the DEBTOR'S payment of personal living expenses from those funds was somehow fraudulent and results in a nondischargeable debt.   HERITAGE maintains that the DEBTOR wrongfully paid to himself, or for his benefit, the sum of

8

$41,491.78 from the period beginning January 1, 2003 through October 31, 2003, during the time of VCC'S existence.

No bankruptcy decisions are cited by HERITAGE in support of its theory that its receivables lien against VCR passed through to VCC. Nor was any support for HERITAGE'S position discovered by this Court's research, and in fact, case law is to the contrary. In *In re Brandon*, 297 B.R. 308 (Bankr.S.D.Ga. 2002), the debtor-physician conducted his medical practice through three separate corporations, failing to inform his lender of the change in corporate structure. While the court determined the debt to be nondischargeable under Section 523(a)(2)(A), it did so because the debtor-physician obtained renewal of the notes without advising the lender of the restructuring. In so holding, the court noted:

> In this case, Debtor pledged [the original corporation's] present and future accounts receivable to [his lender] as collateral for the loan. Debtor was under no duty to continue to operate [the original corporation] for [his lender's] benefit, and the fact of the accounts receivable pledge in no way prevented Debtor from making corporate changes at will, including liquidating [the original corporation's] assets and establishing [the second corporation] using those assets.

297 B.R. at 313. There is also no support for the proposition that the operator of a business that has pledged its receivables is not entitled to reasonable compensation for his efforts that generate the receivables. *See, Brandon v. Anesthesia & Pain Management Associates, Ltd.,* 419 F.3d 594, 597 (7th Cir. 2005) (bonuses paid by corporation to owner-employees were fraudulent transfers only to the extent they were not ordinary wages). There was no evidence that the compensation that the DEBTOR received from VCC was not earned or was excessive relative to the services rendered.

9

HERITAGE was aware of the precarious financial condition of both VCR and the DEBTOR in July, 2002. By October, it was clear that VCR was bankrupt in the true sense of the word. The 1987 Grove crane was fully encumbered by Citicapital's lien. There is no evidence in the record that if HERITAGE had known of the creation of VCC in late October, 2002, that it would have recovered significantly more than it ultimately did.[6] HERITAGE'S accusation in its written closing argument that the DEBTOR "stole" its accounts receivable is entirely unsubstantiated. Payments received by VCR on accounts receivable were deposited in the VCR checking account. Mr. Koenig testified that upon learning of VCC'S existence, it took over collection of the accounts. This is not a case where a corporate debtor transferred existing accounts receivable to a new corporation in fraud of its creditors. *See, Id.* Even after the creation of VCC, VCR continued to collect its accounts receivable for the benefit of HERITAGE. To the extent HERITAGE argues that the DEBTOR owed it a duty to continue to devote all of his efforts to VCR, for HERITAGE'S benefit, that argument has no basis in fact or law.

Neither is this a case where a debtor unlawfully collected receivables contrary to an agreement with its secured lender. HERITAGE chose not to protect itself with a factoring agreement or a lockbox arrangement. *See,* Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code,* ¶ 10.04 (Rev. ed. 2001). Even though HERITAGE had a security interest in VCR'S receivables, it permitted VCR to collect its own accounts and to use the receipts to pay ordinary operating expenses, including wages. Koenig's letter

---

[6]The fallacy in HERITAGE'S argument is the premise that the DEBTOR would have continued to work and to generate receivables for the sole benefit of HERITAGE. The DEBTOR stopped operating VCR for the very reason that all future VCR receivables were subject to being taken by HERITAGE upon demand. Although VCC'S existence was intentionally undisclosed by the DEBTOR, HERITAGE cannot overcome the fact that the DEBTOR simply had no duty to continue to operate VCR for its benefit.

of December 13, 2002, evidences HERITAGE'S continuing agreement, even at that late date, to permit VCR to control the collection of its receivables.

This is not intended to be a criticism of HERITAGE'S conduct.  HERITAGE'S decision to continue to craft a work-out agreement with VCR, despite its bleak outlook in late 2002, was entirely rational.  The only piece of equipment with any equity was the 1984 Linkbelt crane.  The only other collateral with any value was VCR'S receivables.  But HERITAGE was between a rock and a hard place in that regard.  If it immediately exercised its right to collect the receivables for its own account, VCR would be left with no operating funds and would be out of business, with no chance of generating future income with which to pay HERITAGE.  On the other hand, if HERITAGE left VCR in control of its receivables, it ran the risk that VCR'S business would not improve and the funds would be used up in the lost cause of keeping a failing business going for a little while longer. HERITAGE chose the latter course and the business (both VCR and VCC) ultimately failed, resulting in an unsecured deficiency balance.

HERITAGE cannot have it both ways.  In effect, it now seeks to have the Bankruptcy Court view the situation as if HERITAGE had, in late 2002, exercised its right to collect for its own account all of VCR'S receivables.  Moreover, it seeks to have the Court ignore (1) the reality that if it had done so, the business would have ceased and no future receivables would have been generated and (2) that ordinary operating expenses, including wages, must be permitted to be paid from the collected funds if the business is to continue to operate.  In the context of its theory, HERITAGE characterizes the DEBTOR'S failure to

11

remit 100% of the business income as fraud, fiduciary fraud, or willful and malicious

conduct.

**Count I: Section 523(a)(2)(A)**

HERITAGE contends that its debt is nondischargeable under Section 523(a)(2)(A)

for actual fraud.  Under a traditional analysis of this section, the creditor must prove that

(1) the debtor made a representation to the creditor; (2) at the time of the representation,

the debtor knew it to be false; (3) the debtor made the representation with the intent and

purpose of deceiving the creditor; (4) the creditor relied on the representation resulting in

a loss to the creditor; and (5) the creditor's reliance was justifiable.  *Field v. Mans*, 516 U.S.

59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  More recently, the Seventh Circuit has held that

a claim for actual fraud under this provision need not be based upon a false

misrepresentation.  *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000).  Rather, the court

explained that actual fraud "consists of any deceit, artifice, trick, or design involving [the]

direct and active operation of the mind, used to circumvent and cheat another – something

said, done or omitted with the design of perpetrating what is known to be a cheat or

deception."

Relying on *McClellan*'s expanded definition, HERITAGE characterizes the

DEBTOR'S transfer of his business operations to a new corporation following their meeting

on October 22, 2002, as "trick, cunning, dissembly and unfair conduct."  Specifically,

HERITAGE points to the surreptitious creation of VCC, the ongoing negotiations by

DEBTOR'S attorney, and the continued payment of the DEBTOR'S personal expenses

through VCR'S checking account at HERITAGE.   Notwithstanding the fact that the

DEBTOR'S actions may have taken HERITAGE by surprise, *McClellan's* riddance of the

requirement of a misrepresentation by the debtor did not affect the requirement that the

creditor must establish that the fraud created the debt.[7]  *Id.* at 894-95; *In re Spigel*, 260 F.3d

27, 32  (1st Cir. 2001); *In re Petersen*, 296 B.R. 766 (Bankr.C.D.Ill. 2003).  Here, HERITAGE

made the loans well before the actions which purportedly constitute the fraud.[8]

By its language, however, Section 523(a)(2) also encompasses secondary debt

transactions, by excepting from discharge an "extension, renewal or refinancing of credit."

Some courts have interpreted the term "extension of credit" broadly to include an

indulgence or forbearance by a creditor in giving the debtor additional time to pay an

existing debt.  *In re Biondo*, 180 F.3d 126 (4th Cir. 1999);  *In re Brzakala*, 305 B.R. 705

(Bankr.N.D.Ill. 2004); *See, Field v. Mans*, 157 F.3d 35 (1st Cir. 1998)(fraudulently concealed

sale of property tantamount to "extension" of credit).  Other courts construe the term more

narrowly, holding that a mere forbearance from exercising a right to accelerate a loan does

not constitute an extension of credit within the meaning of Section 523(a)(2).  *In re Rigg*, 310

B.R. 725 (Bankr.W.D.Ark. 2004); *In re Booher*, 284 B.R. 191 (Bankr.W.D.Pa. 2002).

In this Court's view, there was no extension of credit within the meaning of the

statute in July, 2002, or anytime thereafter. The DEBTOR and HERITAGE never entered

into a written modification of any of the three loans.  In July, 2002, following the DEBTOR'S

default, the parties met to discuss the delinquent payments.  According to the letter written

---

[7]The elements of actual fraud under the *McClellan* exception are (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the dispute.

[8]HERITAGE makes no contention that the fraud occurred at the inception of the debt.

13

by Koenig, HERITAGE was going to continue to work with the DEBTOR provided he maintained the monthly installment payments on the notes. The DEBTOR did no more than agree to make the payments called for by the notes. Koenig's December 13, 2002, letter evidences that a work-out was still being negotiated.

Even if the Court would consider that an "agreement" reached by the parties at the July meeting constituted a forbearance and such forbearance may be considered an extension of credit, HERITAGE would still fall short of proving its case. There was no evidence that in July, 2002, the DEBTOR did not intend to make future payments on the notes. In fact, he made some payments in September. By the meeting in October, 2002, the amount of the default was increasing. Koenig testified that he knew from looking at the records of the checking account that the DEBTOR was unable to service the debt. The DEBTOR was agreeable to liquidating HERITAGE'S collateral. After the October meeting, payments on accounts were deposited in VCR'S checking account at HERITAGE. The DEBTOR continued to perform some work through VCR. Considering all the evidence, the Court cannot infer an intent to deceive HERITAGE to forbear from taking legal action to collect the full amount of the loan. HERITAGE'S attempts to pigeonhole its claim of nondischargeability within *McClellan's* expansion of Section 523(a)(2)(A) fails.

**Count II: Section 523(a)(4)**

Section 523(a)(4) of the Bankruptcy Code provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). HERITAGE contends that the DEBTOR'S actions constitute fraud or defalcation while acting in a fiduciary capacity. To establish that a debt is

14

nondischargeable for fraud or defalcation while acting in a fiduciary capacity, the creditor must establish both the existence of an express trust or fiduciary relationship and a debt caused by the debtor's fraud or defalcation while acting as a fiduciary.[9]  It bears emphasizing that the fiduciary duties must have been in effect at the time the debt was created.  *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir. 1987); *In re Dempster,* 182 B.R. 790, 801 (Bankr.N.D.Ill. 1995).

Under Illinois law, officers and directors of a solvent corporation occupy a fiduciary relationship toward the corporation and its shareholders, but not to others.  *Brown v. Tenney,* 125 Ill.2d 348, 360, 532 N.E.2d 230 (1988); *Beach v. Miller,* 130 Ill. 162, 170, 22 N.E. 464, 466 (1889).  Only when a corporation becomes insolvent are fiduciary duties owed to creditors.  *Atwater v. American Exchange Nat. Bank,* 152 Ill. 605, 613, 38 N.E. 1017, 1022 (1893) ("When a corporation becomes insolvent, its assets are regarded as a trust fund for the payment of its creditors; and the directors, who are the agents or trustees of the stockholders during the solvency of the corporation, occupy a fiduciary status towards the creditors when the corporation becomes insolvent").  Federal courts sitting in Illinois, consistently apply this common law principle for purposes of Section 523(a)(4).  *In re Reuscher,* 169 B.R. 398, 402 (S.D.Ill. 1994); *In re Rey,* 2005 WL 894820 (Bankr.N.D.Ill. 2005); *In re Hussain,* 308 B.R. 861, 867-68 (Bankr.N.D.Ill. 2004).

---

[9]The nature of the fiduciary relationship necessary to trigger liability under Section 523(a)(4) has been the subject of much disagreement.  *See, In re Marchiando,* 13 F.3d 1111(7th Cir. 1994), *cert. denied,* 512 U.S. 1205 (1994).  A "fiduciary relationship" has been defined by the Seventh Circuit as "a difference in knowledge or power between fiduciary and principal which ... gives the former a position of ascendancy over the latter."  *In re Frain,* 230 F.3d 1014, 1017 (7th Cir. 2000) (*quoting Marchiando,* 13 F.3d at 1116).

HERITAGE does not allege that VCR was insolvent when the loans were made. Thus, the DEBTOR owed no fiduciary duty to HERITAGE at that time. The DEBTOR has admitted that VCR was insolvent from October 22, 2002 through May 19, 2003. Accordingly, beginning October 22, 2002, the DEBTOR occupied a fiduciary relationship toward HERITAGE with respect to VCR'S assets.

In an effort to bypass the critical element of Section 523(a)(4) that the fiduciary relationship must have been in effect at the time the debt was created, HERITAGE contends that the DEBTOR was required to preserve and protect VCR'S assets for its creditors and that the DEBTOR breached his fiduciary duties by using the assets of VCR to do business and generate income through VCC. Specifically, HERITAGE claims that the sum of $41,491.78 paid to the DEBTOR by VCC between January 1, 2003 and October 31, 2003, is money that it should have received if the DEBTOR had fulfilled his fiduciary obligations. HERITAGE does not go so far as to say that these funds were embezzled by the DEBTOR, but that is a possible implication of its position.[10]

HERITAGE does not allege that the DEBTOR transferred or absconded with assets of VCR that were in existence at the time VCC was formed. Rather, the focus is on the receivables generated for VCC for work performed by the DEBTOR on behalf of VCC after that date. The defalcation theory, however, is simply not applicable to VCC'S earnings which were never assets of VCR. HERITAGE makes no claim that VCC was not a "real" corporation and its theory that VCC may have incurred successor liability for VCR'S debts, even if true, does not render VCC'S ownership of its own assets, including its receivables,

---

[10]In its post-trial brief, HERITAGE states that "[i]t is patently clear from the testimony that Debtor was doing his level best to place the cash of VCR and VCC beyond the reach of Heritage Bank and into his own pocket."

a nullity.  In addition, it appears that HERITAGE continued to permit VCC to operate even after learning of its existence in December, 2002.[11]

Here, again, it must be emphasized that the DEBTOR was under no obligation to continue to work for VCR or to keep the business of VCR going.  A claim of defalcation is not established merely because the owner of an insolvent corporation sets up shop as a new corporation.  *In re Casini,* 307 B.R. 800, 819-20 (Bankr.D.N.J. 2004).  Although the DEBTOR used the 1987 Grove crane to perform work for VCC, that crane was fully encumbered by Citifinancial's lien.  Even if the DEBTOR "transferred" the crane from VCR to VCC, HERITAGE suffered no harm from that transfer since there was no equity in the crane to secure its junior lien.  Just as HERITAGE had no right to compel the DEBTOR to continue to work for VCR, it likewise had no right to compel the usage of the 1987 Grove crane for its benefit.[12]

HERITAGE contends that, at a minimum, the DEBTOR received $11,462.55 from VCR during the period beginning October 22, 2002, when it was admittedly insolvent, and ending with its failure on December 19, 2002. The DEBTOR continued to perform some services through VCR during this period and deposited the payments he received from VCR'S creditors into the checking account at HERITAGE.  The DEBTOR was entitled to be paid for his services during this period and the Court cannot say, based on the evidence at trial, that the amount he received was excessive.  Though some of the funds went to pay expenses attributable to operation of VCC, this amount was not established at trial. HERITAGE has failed to prove its claim under Section 523(a)(4).

---

[11]There is no evidence that HERITAGE attempted to attach VCC'S assets.  Even after taking judgment against VCC, there is no evidence that HERITAGE executed on the assets of VCC.

[12]Of course, HERITAGE could have repossessed and sold the crane in enforcement of its junior lien.  But it chose not to do so since the crane was worth less than what was owed Citifinancial.

**Count III: Section 523(a)(6)**

Under Section 523(a)(6), a discharge in bankruptcy does not discharge a debtor from a debt for "willful and malicious injury by a debtor to another entity or property of another entity." 11 U.S.C. § 523(a)(6). In order to prevail under this provision, a creditor must prove (1) the debtor caused an injury; (2) the debtor's actions were willful; and (3) that the debtor's actions were malicious. *In re Mulder*, 307 B.R. 637 (Bankr.N.D.Ill. 2004). "Willful" means it must be a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Under the more rigorous standard of *Geiger*, a creditor must establish either that the debtor subjectively intended to injure the creditor or that the debtor subjectively knew that the creditor's injury was substantially certain to result. *In re Su*, 290 F.3d 1140 (9th Cir. 2002); *In re Marcotte*, 288 B.R. 798 (Bankr.C.D.Ill. 2002). "Malicious" means in conscious disregard of one's duties or without just cause or excuse. *Matter of Thirtyacre*, 36 F.3d 697 (7th Cir. 1994). The determination of whether a debtor acted willfully and maliciously is ultimately a question of fact. *Id*.

Section 523(a)(6) is frequently invoked when a debtor is accused of converting a secured lender's collateral. In a case of conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. *In re Kidd,* 219 B.R. 278, 285 (Bankr.D.Mont. 1998). The proper question is not whether the debtor intended that the secured creditor would go unpaid, but, rather, whether the debtor intended to improperly use the creditor's collateral or its proceeds for

18

purposes other than the payment of the secured debt; if so, there is intentional injury. *In re Russell,* 262 B.R. 449, 455 (Bankr.N.D.Ind. 2001). A debtor's actions are malicious where he sells collateral and uses the proceeds for purposes other than payment of the secured debt, knowing that the property sold is subject to the lender's security interest and knowing that he had a contractual obligation to remit the proceeds to the secured creditor. *Id.* at 455. The appropriate measure of damages for a willful and malicious conversion under Section 523(a)(6) is the value of the property that the creditor could have realized upon repossession at the date of conversion. *In re Cox,* 243 B.R. 713, 720 (Bankr.N.D.Ill. 2000). However, a course of dealing where a creditor has consented to or acquiesced in a disposition of its collateral for purposes other than debt payment, may justify or excuse such continued use. *Russell,* 262 B.R. at 456.

HERITAGE argues that the use of the funds by VCR and VCC which were deposited in VCR'S checking account during the months of October, November and December, for the DEBTOR'S personal benefit constituted a willful and malicious injury. This Court disagrees.

The DEBTOR'S continuing to work for VCR during this period negates a finding of a subjective intent to injure. The DEBTOR'S attorney, on his behalf, continued to explore a restructuring of his debt. While the DEBTOR may have avoided HERITAGE after their meeting in late October, there is no evidence that he had any intent to harm HERITAGE. The DEBTOR continued to deposit the payments received from VCR'S customers into the checking account and the pattern of withdrawals from that account did not significantly change. HERITAGE, aware of VCR'S precarious financial condition, continued to allow

19

the DEBTOR to use the proceeds from the collected accounts receivable. As indicated above, the DEBTOR owed no duty to HERITAGE to continue to operate VCR for any period of time.

Moreover, the DEBTOR was fully aware that he was personally liable to HERITAGE for VCR'S loans. He had good reason to cause the loans to be paid to the fullest extent possible. The Court concludes that the formation of VCC was a desperate, if misguided, attempt by the DEBTOR to keep his business going in the hope of experiencing a dramatic turn for the better – a turn that would have enabled HERITAGE to be paid off. Because of lack of commercial work and his union problems, these hopes were not realized. But throughout all these events, as he credibly testified, the DEBTOR intended and hoped to pay the loans to HERITAGE.

Neither was there sufficient evidence of misuse of HERITAGE'S collateral. As outlined above, because the DEBTOR was collecting the receivables, he was entitled, as a matter of established course of dealing and fairness, to be paid reasonable compensation. The evidence was insufficient to prove that the level of compensation he received, from VCR and VCC, was unreasonably high. HERITAGE could have shut VCR down by taking control of and collecting the receivables itself, but it chose not to do so.

Nor was the evidence sufficient to establish HERITAGE'S loss under the *Cox* standard. Assuming, arguendo, that VCR'S receivables were "converted" by the DEBTOR, the earliest point in time that a conversion could have occurred was in late December, 2002, when HERITAGE called its loans due and demanded an immediate, full payment. There

20

was no proof of what HERITAGE would have received in a liquidation of its collateral at that point in time.  This Court holds that HERITAGE failed to carry its burden to prove willful and malicious injury.

## OBJECTION TO DISCHARGE

HERITAGE contends that the DEBTOR'S discharge should be denied based on Sections 727(a)(2), (a)(4) and (a)(7), which provide:

> (a) The court shall grant the debtor a discharge unless –
> * * *
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed–
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> * * *
> (4) the debtor knowingly and fraudulently, in or in connection with the case–
> (A) made a false oath or account;
> * * *
> (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider.

Denying a debtor a discharge is a drastic remedy. *In re Holstein*, 299 B.R. 211 (Bankr.N.D.Ill. 2003).  In order to effectuate the fresh start policy of the bankruptcy laws, exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting creditor. *Matter of Juzwiak*, 89 F.3d 424 (7th Cir. 1996).  The right to a fresh start is reserved to the honest but unfortunate debtor.  *Matter of Birkenstock*, 87 F.3d

947 (7th Cir. 1996). Grounds for denial of discharge under Section 727(a) require proof by a preponderance of the evidence. *In re Scott*, 172 F.3d 959 (7th Cir. 1999).

**Count IV: Sections 727(a)(2) and (a)(7)**

In order to prevail under Section 727(a)(2), a creditor must prove: (1) that a transfer occurred; (2) that the property transferred was property of the estate; (3) that the transfer occurred within one year of the petition; and (4) that at the time of the transfer the debtor possessed the requisite intent to hinder, delay or defraud a creditor. 11 U.S.C. § 727(a)(2).

HERITAGE contends that the DEBTOR, with the intent to hinder, delay and defraud it, transferred and diverted all of the assets and revenue generating capability of VCR to VCC for his sole and exclusive benefit. Seeking to come within Section 727(a)(2)(B), HERITAGE also argues that the continued use of the Grove crane after VCR'S bankruptcy and the DEBTOR'S bankruptcy, constituted "removal" of property of the bankruptcy estate in each of those cases. The comments by the Court in determining that HERITAGE'S objection to the dischargeability of its debt under Sections 523(a)(2)(A), (a)(4) and (a)(6) are equally applicable here. There was insufficient evidence of any transfer of existing accounts receivable of VCR. Based on this Court's earlier analysis, any claim that there was a transfer of "future" receivables or income of VCR to VCC is rebutted by the absence of any obligation of the DEBTOR to continue VCR'S existence. For the same reasons, HERITAGE'S contention that its rights to the revenue generated by the 1987 Grove crane continued unabated is incorrect. No "transfers" of property occurred which, but for the transfer, would have been property of the estate in either the DEBTOR'S individual bankruptcy case or the earlier filing by VCR.

**Count V: Section 727(a)(4)**

In order to prevail under Section 727(a)(4), the creditor must establish the following: (1) the debtor made a statement under oath; (2) such statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.  The purpose of this provision is to enforce the debtor's duty of disclosure and to ensure that reliable information is furnished in order that the estate can be properly administered.  *In re Broholm*, 310 B.R. 864 (Bankr.N.D.Ill. 2004).

HERITAGE contends that the DEBTOR failed to truthfully answer #10 of the Statement of Affairs, requiring disclosure of certain transfers ("other transfers"), as follows:

> a.  List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.

The only transfer disclosed by the DEBTOR was the transfer of his residence to his nephew. HERITAGE asserts that the DEBTOR was required to disclose all transfers (1) from VCR to VCC; (2) from VCR to the DEBTOR; and (3) from VCC to the DEBTOR.  HERITAGE does not specifically identify the transfers required to be disclosed.  Just what transfers HERITAGE would have had the DEBTOR disclose on his petition is unclear.  Even the evidence of who owned the 1987 Grove crane, an untitled piece of equipment, was ambiguous at best.

Section 727(a)(4) requires HERITAGE to show that the DEBTOR made a false statement with the actual intent to defraud.  Again, this Court has determined that the

23

DEBTOR did not intend to defraud HERITAGE.   When the DEBTOR filed his bankruptcy petition on October 31, 2003, HERITAGE was well aware of the DEBTOR'S business undertakings.   HERITAGE had actual knowledge of all of the alleged "transfers" long before the bankruptcy case.

HERITAGE'S request for denial of the DEBTOR'S discharge pursuant to Sections 727(a)(2), (a)(4) and (a)(7) will be denied.   This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### ###